2021 IL App (1st) 192020

No. 1-19-2020

Opinion filed April 21, 2021

Third Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 97 CR 18961 |
| | ) | |
| ARIEL GOMEZ, | ) | Honorable |
| | ) | LeRoy K. Martin, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    This appeal follows the circuit court's denial of petitioner Ariel Gomez's petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (Code) (735 ILCS 5/2-702 (West 2018)). In 1997, petitioner was charged with two counts of first degree murder following the shooting death of Concepcion Diaz. Petitioner was found guilty on one of the first degree murder counts and sentenced to 35 years' imprisonment. In 2013, petitioner filed a successive petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)). In his amended successive petition, petitioner alleged actual innocence based on newly discovered evidence, consisting of affidavits, expert ballistics evidence, and evidence of

misconduct by the lead detective on the Diaz murder, Reynaldo Guevara. After the circuit court advanced petitioner's postconviction petition for a third stage evidentiary hearing, the parties entered into an agreed order whereby the court granted the petition, vacated petitioner's conviction and sentence, and ordered a new trial. Also, as part of the agreed order, the State nol-prossed one of the first degree murder counts and amended the other first degree murder count to a charge for reckless discharge of a firearm. Petitioner pled guilty to the amended charge and was sentenced to two years' imprisonment, time considered served.

¶ 2     Petitioner subsequently filed the petition for a certificate of innocence at bar. In his petition, petitioner asserted that he was actually innocent of Diaz's murder. In support of this contention, petitioner submitted affidavits, expert forensic evidence, and evidence of Guevara's misconduct. The court did not hold a hearing on petitioner's petition but considered his petition solely on the documentary evidence and the arguments of counsel. Ultimately, the court found that petitioner had not proved that he was innocent of the murder by a preponderance of the evidence and denied his petition. Petitioner appealed.

¶ 3     On appeal, petitioner contends that the court erred in finding that he did not prove his innocence by a preponderance of the evidence where petitioner submitted affidavits from witnesses who averred that he did not shoot Diaz and submitted evidence from a ballistics expert who demonstrated that petitioner could not have been the person who fired the fatal shot at Diaz. Petitioner further asserts that the court erred in disregarding the evidence presented regarding Guevara's misconduct in the investigation. Petitioner asserts that we should reverse the circuit court's denial of his petition or, at in the alternative, remand the matter for an evidentiary hearing.

¶ 4                                  I. BACKGROUND

¶ 5                          A. Diaz's Murder and Petitioner's Trial

¶ 6    In June 1997, petitioner and his codefendants at trial, Jose Dominguez, Dragon Jovanovic, John Yacoub, and Paul Yalda, were driving in petitioner's mother's Nissan SUV celebrating the Chicago Bulls NBA championship victory. Petitioner was sitting in the passenger seat of the vehicle, and Dominguez was the driver. When Dominguez stopped the vehicle at the intersection of Diversey Avenue and Cicero Avenue, several men on the corner flashed gang signs at the group. The men then threw bricks at the vehicle, which broke one of the windows. Dominguez drove away, and petitioner retrieved a .45-caliber semiautomatic pistol that he previously stashed in a nearby side street. Dominguez then drove the vehicle back toward the intersection where the group of men had been standing. Petitioner sat on the passenger side windowsill and pointed his gun over the top of the vehicle. According to petitioner's handwritten custodial statement, which was admitted at trial, petitioner then fired the gun "once in the direction of the group." Shortly after petitioner fired his gunshot, Diaz, who was standing at a bus stop nearby, fell to the ground. Diaz eventually died of a gunshot wound to his back. Diaz also had a second bullet wound in his wrist.

¶ 7    Despite petitioner's statement that he fired his gun only once, witnesses to the shooting testified to hearing more than one gunshot. Rey Arroyo saw petitioner fire one gunshot toward the crowd of people at the intersection and then Arroyo "hit the ground." Arroyo then heard two more gunshots. George Soria also saw petitioner fire his gun toward the crowd. He then heard two or three more gunshots. Sandra Rodriguez saw petitioner sitting on the windowsill of the Nissan SUV "shooting at the crowd." Several other witnesses who testified by way of stipulation indicated that they heard three or as many as five gunshots and then saw the Nissan SUV drive away. None of the witnesses saw anyone else in the area shooting a gun. According to petitioner's statement, he decided to destroy the Nissan SUV after the shooting because he was concerned that someone may have seen the license plate. Petitioner then returned home and hid the gun, where it was later found

by police. One bullet was recovered from Diaz's wrist, but ballistics evidence showed that the recovered bullet could not have been fired from the gun recovered from petitioner's home. Diaz had a second bullet wound from a different gun in his back that caused his death.

¶ 8    In finding petitioner guilty of the first degree murder of Diaz, the trial court acknowledged that the bullet recovered from Diaz's wrist was not fired from the gun found at petitioner's home, but the court drew "a reasonable inference" that petitioner had disposed of the murder weapon just as he had planned the disposal of the Nissan SUV. The court found that petitioner acknowledged that he was upset at the group of people who threw bricks at the Nissan SUV and that they drove back to the intersection after petitioner retrieved the gun so that he could shoot at the group. The court noted that there was no evidence of anyone else firing a gun that night and sentenced petitioner to 35 years' imprisonment. This court upheld petitioner's conviction and sentence on direct appeal over petitioner's contentions that, *inter alia*, the State failed to prove him guilty beyond a reasonable doubt and that the trial court improperly shifted the burden of proof on his motion to suppress his custodial statement. *People v. Gomez*, No. 1-98-4474 (2000) (unpublished order under Illinois Supreme Court Rule 23).

¶ 9                          B. Federal Proceedings

¶ 10   Codefendant Dominguez had been convicted along with petitioner at a severed trial on an accountability basis for petitioner's shooting of Diaz. On direct appeal, however, this court reduced Dominguez's conviction to aggravated discharge of a firearm and remanded for resentencing. *People v. Dominguez*, No. 1-98-4519 (2001) (unpublished order under Illinois Supreme Court Rule 23). This court found that the trial court erred in finding that the fatal bullet must have come from the Nissan SUV. The court concluded that there was thus no evidence that Dominguez shared a common design with whoever shot and killed Diaz. *Id.* at 12-13. The court found, however, that

there was sufficient evidence to find Dominguez guilty of aggravated discharge of a firearm under a theory of accountability. The court noted that Dominguez admitted in his statement that he was in the Nissan SUV with petitioner when petitioner fired a gun into a crowd of people at the corner of the intersection of Cicero Avenue and Diversey Avenue. *Id.* at 14.

¶ 11    Following this court's order in *People v. Dominguez*, petitioner filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 in the federal district court, arguing that his conviction should be reversed based upon the reversal of Dominguez's conviction. The district court denied petitioner's petition. *United States ex rel. Gomez v. Pierson*, 232 F. Supp. 2d 888, 889 (N.D. Ill. 2002). The district court stated that in light of this court's reversal of Dominguez's conviction, "[i]t is unjust that [petitioner] should sit in prison, convicted of murder, while his co-defendant should be cleared of it on the grounds that one cannot have accomplice liability if the principal—[petitioner]—is innocent." *Id.* at 890. The court found, however, that there is no federal right to a "consistent verdict." *Id.* The court further noted that petitioner admitted to firing a gun in the direction of Diaz and admitted to crashing his mother's Nissan SUV in an attempt to keep police off of his trail. *Id.* at 891.

> "Numerous witnesses, including [petitioner's] co-defendants, observed him firing toward the victim. [Petitioner] himself stated that no one in the vicinity other than himself had a gun. While ballistic evidence shows that the gun found in [petitioner's] mother's house was not the gun that killed the victim, it is plausible that [petitioner] used a different gun to commit the murder." *Id.*

The court concluded that a reasonable juror could find that petitioner disposed of the murder weapon before his arrest and was guilty of murder. *Id.*

¶ 12    The Seventh Circuit Court of Appeals affirmed the district court's denial of the petition for *habeas corpus*. *Gomez v. Jaimet*, 350 F.3d 673 (7th Cir. 2003). The Seventh Circuit agreed with the district court that "a disturbing aspect of this case is that Dominguez's conviction was overturned by a panel of the Illinois Appellate Court on the basis that there was insufficient evidence to prove that [petitioner] actually fired the shots killing the victim." *Id.* at 678. The Seventh Circuit affirmed, however, that there was no federal requirement for consistent verdicts. *Id.* at 679. The Seventh Circuit concluded, as the district court did, that

> "it would also be reasonable for the trier of fact to conclude that [petitioner] covertly disposed of the gun used in the shooting without alerting his friends. Indeed, it is entirely possible that [petitioner] owned more than one chrome gun and that he led police to the one that he left at home on the night of the shooting." *Id.* at 681.

¶ 13                      C. Initial Postconviction Petition

¶ 14    Petitioner filed his initial postconviction petition in May 2004. Petitioner alleged, *inter alia*, that the evidence at trial was insufficient to support his conviction beyond a reasonable doubt. Petitioner's argument was based on the fact that the bullet recovered from Diaz's wrist could not have been fired from the gun recovered from petitioner's home. Petitioner also raised a claim of actual innocence based on newly discovered evidence in the form of an affidavit from codefendant Jovanovic. In the affidavit, Jovanovic averred that he saw petitioner fire a single shot from the windowsill of the Nissan SUV and the pistol the police recovered from petitioner's home was the only gun that petitioner fired that evening. The circuit court summarily dismissed the petition at the first stage of proceedings, finding that there was ample evidence to support petitioner's conviction where several witnesses testified that petitioner had fired a gun in the direction of the group of people standing on the corner at the intersection and that petitioner

admitted in his handwritten statement that he had shot at the group of people. The court further found that Jovanovic's affidavit was not newly discovered evidence and was not likely to change the result on a retrial because the trial court had drawn the reasonable inference that petitioner had disposed of the murder weapon. Accordingly, the court dismissed petitioner's initial postconviction petition, finding that it was frivolous and patently without merit. This court affirmed that judgment on appeal. *People v. Gomez*, No. 1-04-2701 (2005) (unpublished order under Illinois Supreme Court Rule 23).

¶ 15                    D. Successive Postconviction Petition

¶ 16    Petitioner filed a *pro se* successive postconviction petition in January 2013. In his successive petition, petitioner contended that he was actually innocent based on newly discovered evidence. First, petitioner asserted that newly discovered evidence showed that Chicago police recovered and then destroyed a .45-caliber ammunition magazine from the scene of the shooting or from the recovered Nissan SUV. Petitioner also asserted that newly discovered evidence showed that Guevara purposefully failed to memorialize the exculpatory statement of eyewitness Ruth Antonetty. Finally, petitioner contended that newly discovered evidence showed that Guevara had a documented history of illegal and unethical conduct in his investigations.

¶ 17    Petitioner attached an affidavit from Antonetty to his petition. In the affidavit, Antonetty averred that on the night of the shooting, she saw members of the Latin Kings gang standing on the corner of Cicero Avenue and Diversey Avenue. She also saw members of the Latin Brothers street gang at the intersection. She then saw petitioner's Nissan SUV stop at the traffic light on Cicero Avenue and saw the Latin Brothers gang members "flashing gang signs" and throwing objects at the vehicle. Antonetty saw petitioner sitting on the windowsill of the passenger side of the Nissan SUV holding a handgun. She saw petitioner fire "a single shot into the air." She "saw

that his arm was positioned straight up into the air. It was like he was firing a warning shot." Antonetty saw the bullet go into a pole that was 6 to 10 feet away from where she was standing in a nearby parking lot. Antonetty averred that she "heard the bullet that came from the [Nissan] SUV go past me over my head and into the pole." Antonetty heard two or three more gunshots, but she averred that they did not come from the Nissan SUV. She averred that one of the Latin Brother gang members fired those gunshots. After the Latin Brother gang member fired those shots, she saw a person at the bus stop (Diaz) "hit the ground." Antonetty averred that it was these gunshots from the Latin Brother that killed Diaz, not the "warning shot" that petitioner fired from the Nissan SUV.

¶ 18   Antonetty further averred that she subsequently spoke to Guevara at the police station. Antonetty averred that she told Guevara what she saw, but Guevara insisted that petitioner was the person who shot Diaz. Antonetty averred that Guevara attempted to intimidate her into identifying petitioner as the shooter, but she repeatedly insisted that she had seen petitioner fire only a single shot into the air.

¶ 19   The court advanced petitioner's petition to the second stage of postconviction proceedings, and counsel joined the case to represent him. Counsel filed an amended petition repeating the claims petitioner made in his *pro se* petition with regard to Antonetty's affidavit and Guevara's history of misconduct but adding new claims based on a report from a ballistics expert. The amended petition also expanded on Guevara's unethical conduct in this case, asserting that Guevara intimidated witnesses into identify petitioner as the shooter and physically abused petitioner and forced him to sign the handwritten inculpatory statement that was admitted as his trial.

¶ 20    The State filed a motion to dismiss the amended successive postconviction petition. The court ruled on the motion in a written order dismissing some of the claims in the amended petition but allowing the petition to proceed to a third stage evidentiary hearing on petitioner's claim for actual innocence based on Antonetty's affidavit, petitioner's *Brady* claim (see *Brady v. Maryland*, 373 U.S. 83 (1963)) with regard to the destroyed ammunition clip that was found at the scene, and petitioner's allegations of Guevara's misconduct.

¶ 21    Rather than conduct the evidentiary hearing, the parties entered into an agreed order granting the petition and vacating petitioner's conviction and sentence. As part of the order, the court ordered a new trial, and the State nol-prossed the first degree murder charge in count I of the indictment. The State further amended count II of the indictment from first degree murder to a charge for reckless discharge of a firearm. Rather than conduct the new trial, the court accepted petitioner's plea of guilty to the amended charge of reckless discharge of a firearm. The court sentenced petitioner to two years' imprisonment, time and mandatory supervised release considered served.

¶ 22                        E. Petition for Certificate of Innocence

¶ 23    Petitioner subsequently filed a petition for a certificate of innocence pursuant to section 2-702 of the Code (735 ILCS 5/2-702 (West 2018)). Petitioner noted that in order to obtain a certificate of innocence, he was required to satisfy the four factors set forth in section 2-702. First, petitioner had to show he was convicted of one or more felonies, he was sentenced to prison, and he served any part of the that sentence. *Id.* § 2-702(g)(1). Second, petitioner had to show that his conviction was reversed or vacated and that the indictment or information was dismissed. *Id.* § 2-702(g)(2)(A). Third, petitioner had to show that he was innocent of the offenses charged in the

indictment. *Id.* § 2-702(g)(3). Finally, petitioner had to show that he did not by his own conduct cause or bring about his conviction. *Id.* § 2-702(g)(4).

¶ 24    In his petition, petitioner asserted that he satisfied the first factor when he was convicted of the murder of Diaz and served 21 years of his 35-year sentence. Petitioner asserted that he satisfied the second factor when the parties entered into the agreed order granting his successive postconviction petition. Petitioner asserted that as part of that order, his conviction was vacated and the State "dropped the murder charge on a *nolle prosequi* motion." Petitioner contended that he satisfied the fourth factor because he did not act in a way to mislead the authorities into believing he committed the offense for which he was convicted.

¶ 25    Finally, petitioner maintained that he had proved his innocence of Diaz's murder by a preponderance of the evidence. Petitioner submitted the same affidavit from Antonetty that he submitted with his successive postconviction petition. Antonetty averred that Diaz was shot by a gang member, not petitioner. Antonetty knew petitioner was not the shooter, but her exculpatory evidence was suppressed by Guevara. Petitioner also submitted affidavits from two other eyewitnesses, Maria Castro and Debbie Daniels, and his codefendant, Jovanovic, that petitioner asserted were consistent with the theory that he fired a single gunshot into the air and did not shoot Diaz.

¶ 26    Petitioner further contended that the ballistics evidence provided by expert John Nixon demonstrated that petitioner could not have shot Diaz from his position on the windowsill of the Nissan SUV. The report indicated that the bullet that struck Diaz had an upward trajectory, but petitioner, firing from an elevated height, would have shot Diaz with a downward trajectory. Nixon opined that the person who shot Diaz would have been standing on the ground holding the gun at

waist height. Nixon further opined that Diaz's fatal bullet wound could not have been caused a .45-caliber bullet, like that which would have been fired from the gun found in petitioner's home.

¶ 27   Petitioner also asserted that his conviction hinged solely on Guevara's testimony and upon his own custodial statement which had been obtained by Guevara. Petitioner asserted that both Guevara's testimony and petitioner's custodial statement had been "utterly discredited" based upon Guevara's "pattern of misconduct." Petitioner did not dispute that he shot a gun from the Nissan SUV but asserted that in light of this exculpatory evidence there was "no evidence" that he shot and killed Diaz.

¶ 28   After petitioner filed his petition, the State informed the court that it intended to intervene and file a response. The court asked the parties if they planned to proceed "by way of oral argument." The assistant state's attorney replied that the matter would proceed by oral argument. At a subsequent hearing, the court clarified that the parties were "going to simply argue." Petitioner's counsel responded, "That's right." Following argument by the parties, the court issued its judgment in an oral ruling. The court stated that it was clear that petitioner had satisfied the first element of the statute because he had been convicted of a felony, sentenced to a period of imprisonment, and served at least a part of that sentence. The court further found that petitioner satisfied the second element because his conviction was reversed or vacated. The court was also "convinced" that petitioner did not do anything to bring about his own conviction.

¶ 29   The court found that there was therefore only one element left for it to consider: whether petitioner established by a preponderance of the evidence that he was innocent of the offense for which he was charged. The court noted that petitioner submitted "a lot" of evidence in support of his innocence. The court specifically identified Antonetty's affidavit. However, the court found the proposed testimony in the affidavit "a little confusing." The court noted that Antonetty averred

that petitioner fired the gun straight up in the air, but she heard the bullet go over her head. "I'm having a difficult image [*sic*] of a round being fired straight into the air but yet the round going over her head." The court also took issue with Nixon's ballistics report. The court noted that the report indicated that Diaz was stuck with a bullet that was smaller than a .45-caliber, which was the caliber of firearm that police discovered in petitioner's home. The court noted, however, the report acknowledged that Diaz's wrist was struck by a .45-caliber bullet. "So what I would take from that testimony or from the report is that the victim was struck by more than one gunman or either a gunman had two different firearms ***." The court also found it "odd" that after the group on the street threw bricks at the SUV, petitioner left the scene and came back with a gun to fire a warning shot. The court observed that, after the shooting, petitioner and his codefendants decided to wreck the SUV. The court found that "all of those things *** raise too many questions in my mind." The court found that petitioner was therefore unable to satisfy his burden to show by a preponderance of the evidence that he was innocent of the charged offense. Accordingly, the court denied petitioner's petition for a certificate of innocence.

¶ 30    Petitioner filed a motion to reconsider or, in the alternative, to order an evidentiary hearing. In the motion, petitioner asserted that despite finding some of the evidence presented "confusing" and "odd," the court did not offer petitioner an opportunity to explain the evidence or provide additional context. Petitioner maintained that he should be provided an opportunity to supplement the record with additional evidence or that the court should grant petitioner the right to present evidence at an evidentiary hearing.

¶ 31    At the hearing on petitioner's motion, the court stated that it was "almost certain" that at some point during the proceedings, it inquired into whether the parties were going to present live witnesses or whether the matter would be decided solely on "the argument of counsel and on the

evidence—or the documents and exhibits that are attached to these various papers." The court noted that it was not unusual for certificates of innocence matters to proceed in that manner. The court stated that it was therefore "surprised" that petitioner proceeded by argument only but was now asking for an evidentiary hearing after the court had already made its ruling. The court indicated that whether or not to hold an evidentiary hearing in this matter is something the parties would have discussed with the court "sometime [*sic*] ago."

¶ 32     With regard to the documents and exhibits, the court noted that it found Antonetty's affidavit to be "inconsistent" with petitioner's argument that he was actually innocent. The court again pointed out that Antonetty averred that she saw petitioner fire the gun straight up into the air, but then she said that she heard the bullet go over her head. The court could only reconcile this inconsistency if Antonetty was standing right next to the Nissan SUV, but Antonetty averred that she was standing in the parking lot. "So it seemed inconsistent and confusing to me that she says she sees someone sitting in the car firing a weapon straight up in the air like a warning shot but she hears a bullet go over her head."

¶ 33     The court also addressed Nixon's ballistics report. The court observed that the report indicated that Diaz was struck by a bullet with a caliber smaller than a .45-caliber. But the report also noted that Diaz was struck on the wrist by a .45-caliber bullet. The court stated that this would mean Diaz was shot by more than one person or "one person holding two weapons, both a .45 and some other caliber weapon." The court noted that there was no question petitioner fired a .45-caliber gun that day and reiterated that it found the ballistics report "a little odd." The court also noted that petitioner borrowed the Nissan SUV from his mother without her permission and then wrecked the vehicle after the shooting. The court found that all of this evidence, taken together, did not "seem to indicate actual innocence." The court concluded that if petitioner wished to

present other evidence, he had that option during the pendency of the proceedings, but the court would not allow him to "get the benefit of the Court's ruling" and then seek to introduce other evidence. Petitioner now appeals.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, petitioner contends that the court erred in finding that he failed to prove his innocence by a preponderance of the evidence. Petitioner maintains that he proved his innocence through affidavits from exonerating witnesses, the expert ballistics reports from Nixon that showed that petitioner could not have fired the fatal shot, and evidence that impugned the integrity of the investigation conducted by Guevara. Petitioner asserts that this court should reverse the trial court's denial of his petition or, in the alternative, remand for further proceedings, including an evidentiary hearing.

¶ 36                          A. Certificate of Innocence

¶ 37    A person who was wrongly convicted and imprisoned may file a petition for a certificate of innocence in the circuit court to seek compensation in the Court of Claims. See 735 ILCS 5/2-702(a), (b) (West 2018); 705 ILCS 505/8(c) (West 2018). To obtain a certificate of innocence under section 2-702 of the Code, a petitioner must prove by a preponderance of the evidence that:

"(1) [he] was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either [he] was found not guilty at the new trial or [he] was not retried and the indictment or information dismissed; or (B) the

statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

(3) [he] is innocent of the offenses charged in the indictment or information or his *** acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and

(4) [he] did not by his *** own conduct voluntarily cause or bring about his *** conviction." 735 ILCS 5/2-702(g) (West 2018).

Here, the circuit court found that petitioner satisfied three of the four elements of section 2-702 but failed to demonstrate that he was innocent of the offenses charged in the indictment by a preponderance of the evidence.

¶ 38                                B. Standard of Review

¶ 39    Initially, we note that the parties disagree as to the standard of review to be applied in this case. Petitioner asserts that we should review *de novo* the circuit court's ruling that he failed to prove his innocence by a preponderance of the evidence. Petitioner acknowledges that this court has applied an abuse of discretion standard of review to denials of certificates of innocence but asserts that a *de novo* standard is appropriate in this case because the circuit court "refused" to permit an evidentiary hearing and decided the case solely on the documentary evidence and a cold record.

¶ 40    Despite petitioner's contentions to contrary, it is well-settled that the determination of whether a petitioner is entitled a certificate of innocence is committed to the discretion of the circuit court. See, *e.g.*, *Rudy v. People*, 2013 IL App (1st) 113449, ¶ 11 (citing *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993)); *People v. Dumas*, 2013 IL App (2d) 120561, ¶ 17. Indeed, the statute itself provides that "the court, *in exercising its discretion* as permitted by law

regarding the weight and admissibility of evidence submitted pursuant to this Section." (Emphasis added). 735 ILCS 5/2-702(a) (West 2018). Consistent with that precedent, this court has applied an abuse of discretion standard even where the petitioner proceeded solely on documentary evidence without an evidentiary hearing. *People v. McClinton*, 2018 IL App (3d) 160648, ¶¶ 7, 22. Accordingly, we will review the circuit court's ruling that petitioner failed to prove he was innocent of the charged offense for abuse of discretion.

¶ 41                                    C. Petitioner's Innocence

¶ 42    Petitioner asserts that he proved his innocence by a preponderance of the evidence based on the exonerating affidavit from Antonetty, the ballistics report, and the evidence presented of Guevara's history of misconduct. He maintains that the proof of his innocence is overwhelming and was recognized by the district court, Seventh Circuit, and even this court in its ruling on Dominguez's direct appeal. Petitioner acknowledges that the evidence is unrebutted that he fired a gun that night, but he asserts the evidence is equally clear that the bullet he fired did not kill Diaz.

¶ 43                                    1. *Petitioner's Gunshot*

¶ 44    Petitioner first contends that the unrebutted evidence shows that he fired a single gunshot up into the air and did not shoot Diaz. Petitioner points to his own postconviction affidavits and Jovanovic's affidavit in which both he and Jovanovic averred that petitioner had only one gun that night and fired only one bullet into the air. Petitioner notes that even in his custodial statement he admitted to firing only a single bullet. Petitioner further contends that Antonetty's affidavit corroborates his and Jovanovic's version of the events where she averred that she saw petitioner fire a single bullet straight up into the air. Petitioner maintains that, even considering the evidence presented at his trial, he sufficiently showed that it is more likely than not that the bullet he fired did not strike Diaz.

¶ 45 Despite petitioner's contentions to the contrary, there is ample evidence from which a reasonable trier of fact could find that petitioner failed to prove his innocence by a preponderance of the evidence. First, numerous witnesses at petitioner's trial testified that they saw petitioner fire his gun at the crowd of people gathered at the intersection rather than straight up into the air as petitioner now asserts. Soria testified that petitioner had his arms "outside of the vehicle on top of the roof" and pointed a gun "[i]n the direction of a crowd" that was gathered at the intersection. Soria saw petitioner fire one shot "[i]nto the crowd" and then heard two or three more shots. Soria did not see anyone else in the area shooting a gun. Similarly, Arroyo testified that petitioner was "shooting over the" Nissan SUV "[a]t the crowd." Rodriguez also testified that petitioner was leaning on the roof of the Nissan SUV and shooting over the roof. Numerous witnesses heard more than one gunshot. In petitioner's handwritten statement, petitioner acknowledged that he "took the gun and pointed over the top of the [Nissan SUV] *at the group of people*" and "fired the gun once *in the direction of the group*." (Emphases added.)

¶ 46 The affidavits petitioner has submitted in support of his certificate of innocence do not serve to rebut this evidence and establish his innocence by a preponderance of the evidence. Jovanovic, in his affidavit, averred that petitioner fired a .45-caliber semiautomatic pistol "from the [Nissan SUV]." After the shooting, Jovanovic saw petitioner place the pistol on a shelf in his home where it was later discovered by police. Jovanovic averred that .45-caliber pistol was the only gun petitioner fired that evening. First, this evidence does not rebut the testimony of the trial witnesses that petitioner fired his gun into the crowd at the intersection. Jovanovic merely averred that he saw petitioner fire a single gunshot from the Nissan SUV. He did not state where petitioner was pointing the gun. Secondly, this court has previously considered Jovanovic's affidavit and

found it "inherently unreliable" because it amounted to a recantation of his June 1997 custodial statement where he averred that petitioner fired two shots. *Gomez*, No. 1-04-2701 at 12.

¶ 47    Nor do we find Antonetty's affidavit persuasive of petitioner's innocence. Like the circuit court, we find Antonetty's description of the where petitioner fired his gun "confusing." As noted, Antonetty averred that she saw petitioner fire a single gunshot with his arm pointed "straight up into the air." She also averred, however, that she heard the bullet go over her head and strike a pole nearby. The bullet striking the pole over her head would suggest petitioner fired the gun more horizontally rather than vertically as Antonetty's "straight up into the air" language depicts. Petitioner asserts that there is nothing implausible or impractical about Antonetty's affidavit, as the circuit court found and that her testimony that the bullet went over her head does not imply that the bullet went horizontally as the circuit court found. However, Antonetty's testimony that the bullet travelled over her head is more consistent with the testimony of Arroyo, Soria, and Rodriguez who saw petitioner fire the gun over the roof of the Nissan SUV at the crowd of people standing near the intersection. It is also consistent with petitioner's custodial statement where he acknowledged that he fired the gun over the roof of the SUV. Indeed, Antonetty is the only witness, aside from petitioner himself, who asserted that petitioner fired his gun straight up into the air. Antonetty's affidavit is, at best, inconsistent with the wealth of other evidence presented in this case regarding the manner in which petitioner fired his gun. If presented at petitioner's trial, together with Jovanovic's partial recantation, it may have served to cast doubt on the State's case in proving petitioner guilty beyond a reasonable doubt. However, petitioner's burden to prove that he is innocent by a preponderance of the evidence is a different, more exacting standard. See *Dumas*, 2013 IL App (2d) 120561, ¶ 19; *People v. Pollock*, 2014 IL App (3d) 120773, ¶ 37 ("the Code contemplates the differences between actual innocence and a finding by a court of review

that no rational jury could find beyond a reasonable doubt that the State proved all elements of the crimes charged" (citing *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19)).

¶ 48    Petitioner asserts, however, that even the federal courts recognized his innocence in ruling on his *habeaus corpus* petition. Petitioner contends that both the district court and the Seventh Circuit "readily acknowledged the evidence of" his innocence. However, that is not what the federal courts found. Both courts merely recognized the incongruity between the reversal of Dominguez's conviction based on the lack of evidence of petitioner's guilt and the affirmance of petitioner's conviction. In fact, far from recognizing petitioner's innocence, the district court observed that there was ample evidence of petitioner's guilt based on the testimony of "[n]umerous" eyewitnesses and that a reasonable juror could find that petitioner "used a different gun to commit the murder." *United States ex rel. Gomez*, 232 F. Supp. 2d at 891. The Seventh Circuit reached a similar conclusion. *Gomez*, 350 F.3d at 681 (7th Cir. 2003). As such, we find no support for petitioner's claim of innocence based on the federal court proceedings.

¶ 49                              2. *Ballistics Evidence*

¶ 50    Petitioner next contends that Nixon's expert ballistics report establishes his innocence by a preponderance of the evidence. Petitioner maintains that the report demonstrates that the gun he fired and was later recovered by police could not have been the gun used to kill Diaz. Petitioner also points out that a gun magazine was discovered at the scene that likely came from the gun found at petitioner's home, suggesting that it was only gun petitioner fired that evening. However, Chicago Police Department (CPD) records show that the magazine was destroyed in CPD custody.

¶ 51    According to Nixon's report, police recovered a P90 .45-caliber magazine immediately after the incident. Nixon stated that this magazine was compatible only with the P90 model Ruger pistol that police recovered from petitioner's home. The Ruger pistol recovered from petitioner's

home had a missing magazine. Nixon opined that regardless of whether petitioner fired a single gunshot straight into the air or whether he fired his gun horizontally over the top of the Nissan SUV, petitioner "could not have been the person who shot Mr. Diaz." Nixon based this conclusion on the fact that a bullet that was fired straight up into the air and fell from the sky would not cause significant injury to a human. In addition, a direct shot over the Nissan SUV from petitioner's vantage point on the vehicle's passenger side windowsill would have struck Diaz with a downward trajectory. Nixon opined based on the autopsy report that the fatal bullet that struck Diaz had a "significant upward trajectory." This trajectory was inconsistent with a bullet fired over the top of a high vehicle such as the Nissan SUV, and was consistent with a shot being fired from several feet away by someone holding a pistol at waist height.

¶ 52    Nixon further opined that there was no evidence to indicate that a .45-caliber bullet caused Diaz's fatal wound. Nixon opined that the fatal wound was caused by a smaller caliber gun. He noted, however, that the wound to Diaz's wrist "was known to have been created by a [.]45 caliber bullet." Nixon opined that the bullet removed from Diaz's wrist could not have been fired from a Ruger P90, however, due to "class characteristics differences."

¶ 53    As the circuit court found, the ballistics report prepared by Nixon does not serve to establish that petitioner is innocent by a preponderance of the evidence. It is well-settled that petitioner shot a .45-caliber pistol, which Nixon opined was not the gun that caused Diaz's fatal wound. Nixon opined that the fatal wound was caused by a smaller caliber gun. Nixon acknowledged, however, that Diaz had a second wound that was caused by a .45-caliber bullet. As the circuit court recognized, the report suggests that there was either more than one gunman or that one person fired more than one gun.

¶ 54    Despite acknowledging that he fired a gun that night, petitioner has maintained that he fired only one time and fired only one gun. However, Soria testified that he heard two or three gunshots, including the gunshot he both heard and saw being fired from petitioner's gun. Arroyo likewise testified that he heard two more gunshots after he saw petitioner fire one shot. Although neither Arroyo nor Soria testified that they saw petitioner fire more than one gunshot or saw him holding more than one gun, both testified that they did not see anyone else in the area with a gun. Other witnesses testified to hearing multiple gunshots. These circumstances led the trial court at petitioner's trial to suggest that petitioner may have fired more than one gun and then "disposed" of the murder weapon. The circuit court in ruling on petitioner's certificate of innocence expressed a similar impression, and the federal district court and Seventh Circuit noted that such a conclusion was not unreasonable. Although Antonetty presented a somewhat different version of the events, the court was not required to credit her affidavit over the testimony of the other witnesses in determining whether petitioner proved his innocence by a preponderance of the evidence. Likewise, nothing in Nixon's report undermines these inferences.

¶ 55    Petitioner contends, however, that the magazine clip that was recovered from the scene and then later destroyed while in Chicago police custody demonstrates that he fired only one gun that evening and that the gun was the .45-caliber Ruger P90 that could not have fired the bullet that killed Diaz. Petitioner points out that the magazine clip could only fit his .45 Ruger pistol and the Ruger pistol that was recovered from his home after the shooting was missing its magazine clip. Petitioner learned about the destroyed magazine clip through a postconviction Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2018)) request. Petitioner asserts that CPD records indicate that the magazine was destroyed in October 2000, two years after his conviction, and while his petition for leave to appeal to the Illinois Supreme Court was still pending. Petitioner

posits that Guevara was responsible for suppressing the magazine clip evidence from his trial that would have belied the "two gun" theory.

¶ 56    We find petitioner's argument in this regard unpersuasive. It is virtually undisputed that petitioner fired a .45-caliber gun on the night of the incident. The gun clip magazine found at the scene may have served as additional evidence of the fact. It does not, however, dispute the theory cited by both the trial court and the circuit court in the rulings on petitioner's petitions that petitioner had more than one gun but disposed of the murder weapon. As noted above, this evidence may have served to provide a reasonable doubt as to petitioner's guilt of the charged offense (see *Dumas*, 2013 IL App (2d) 120561, ¶ 19), but we cannot say that the circuit court abused its discretion in finding that the ballistics report and the evidence concerning the magazine clip did not serve to establish petitioner's innocence by a preponderance of the evidence.

¶ 57                                    3. *Guevara's Misconduct*

¶ 58    A through line of petitioner's contentions on appeal is that his conviction was based in large part on misconduct by then-detective Guevara during the investigation. Petitioner asserts that since his conviction, evidence has come to light of Guevara's pattern of misconduct during his time as a detective in the CPD. This court has recognized that Guevara has a history of influencing witnesses. See, *e.g.*, *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 35; *People v. Almodovar*, 2013 IL App (1st) 101476, ¶ 79. Petitioner asserts that Antonetty was one such witness in this case and that Guevara suppressed her exonerating testimony. Petitioner also attached to his petition affidavits from Castro and Daniels. Castro averred that she was at the scene of the shooting, but she could not identify the shooter or the driver of the Nissan SUV. She averred that after the incident, she spoke to detectives at the police station. She could not recall the name of the detective she spoke with, but she averred that the detective pressured her to say that she saw the driver of

the SUV and the shooter. Castro refused because she did not know the shooter or the driver and could not identify them. Similarly, Daniels averred that she could not identify the shooter or the driver, but Guevara pressured her to say that should identify the shooter. Guevara even produced photographs and told Daniels to identify one of the people as the shooter. He also pressured her to testify at trial, but she refused.

¶ 59    Despite Guevara's well-documented history of witness intimidation and other misconduct, petitioner's contentions in this regard do not serve to bolster his claim of innocence. None of the eyewitnesses who testified at trial, Soria, Arroyo, or Rodriguez, suggested that they had been pressured by Guevara, or anyone else, into identifying petitioner as the shooter. Although Castro and Daniels averred that they had been pressured by Guevara into identifying a shooter, neither suggested that they were forced to identify petitioner as the shooter, nor, more importantly, did they suggest that they had evidence of petitioner's innocence that Guevara suppressed. Rather, both averred that they were unable to identify the shooter. In addition, as noted, even if we were to credit Antonetty's affidavit regarding Guevara's misconduct and her version of the events, that still would not be sufficient to establish petitioner's innocence when weighed against the other evidence presented in this case.

¶ 60    Petitioner also attached to his petition examples of Guevara's misconduct in other cases. As this court has recognized, however, evidence of Guevara's misconduct in other cases is immaterial and does not support a claim of actual innocence. *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 58. We also recognize that petitioner submitted an affidavit averring that Guevara physically abused him and forced him to sign the inculpatory handwritten statement that was admitted at his trial. As noted, however, the trial court's finding on guilt and the circuit court's denial of petitioner's certificate of innocence were based in large part on the testimony of the

numerous eyewitness who saw petitioner shooting and heard multiple gunshots. The evidence petitioner has submitted is insufficient to overcome that testimony. Thus, although this court cannot deny Guevara's well-documented history of misconduct in criminal investigations, the evidence presented regarding his misconduct in this case does not serve to bolster petitioner's claim of innocence. Accordingly, we find no abuse of discretion.

¶ 61                                   4. *Evidentiary Hearing*

¶ 62    Finally, we address petitioner's contention that the court should have ordered an evidentiary hearing in order to give petitioner an opportunity to fully present his claim. Petitioner points out that the court found Antonetty's affidavit "confusing" and Nixon's report "odd." Petitioner asserts that he should have been given the opportunity to address the court's confusion at an evidentiary hearing.

¶ 63    We first observe that the act does not require an evidentiary hearing. Secondly, this issue was discussed at trial. Petitioner did not request an evidentiary hearing until after the circuit court denied his petition. Several times during the proceeding, the court asked the parties whether they were going to present witnesses or whether they would proceed solely on the documentary evidence and by way of oral argument. Petitioner's counsel acknowledged that he would proceed by argument only. As the circuit court noted, if petitioner had additional evidence he wished to present through an evidentiary hearing, he had the opportunity to request such a hearing prior to the court's ruling. However, it would seem manifestly unfair to allow petitioner to have the benefit of the trial court's ruling and only then, when the ruling was unfavorable to petitioner, to grant petitioner an evidentiary hearing. Petitioner also contends that additional evidence has come to light since the circuit court's ruling such as depositions from Antonetty, Castro, and Daniels in his civil proceeding against Guevara. However, if petitioner wished to submit this evidence in support

of petition, he had the ability to wait until the evidence was available before filing his petition or to request a continuance before the circuit court. Accordingly, we find no error and decline petitioner's request to remand for an evidentiary hearing.

¶ 64                                    D. Indictment

¶ 65    Even if we found that petitioner had proved that he was innocent of the charged offense by a preponderance of the evidence, we would nonetheless affirm the circuit court's denial of his petition for a certificate of innocence where petitioner failed to establish that his indictment was dismissed as required by section 2-702(g)(2)(A). See 735 ILCS 5/2-702(g)(2)(A) (West 2018). Petitioner asserts that the State has forfeited this argument because the circuit court found that petitioner had satisfied this element and the State did not cross-appeal that ruling. However, it is well-settled that this court may affirm the circuit court's judgment on any basis appearing in the record, whether or not the circuit court relied on that basis or whether or not the circuit court's ruling was correct. See, *e.g.*, *People v. Jones*, 2015 IL App (1st) 133123, ¶ 19; *People v. Olsson*, 2015 IL App (2d) 140955, ¶ 17 ("We review the trial court's judgment rather than its reasoning, and we may affirm on any basis supported by the record."); *People v. Couch*, 2012 IL App (4th) 100234, ¶ 18.

¶ 66    In support of its contention that petitioner failed to establish that his indictment had been dismissed, the State cites this court's recent decision in *People v. Moore*, 2020 IL App (1st) 190435.[1] In *Moore*, the petitioner was convicted of four offenses following a robbery and subsequent police chase. *Id.* ¶¶ 5-6. The petitioner's four convictions were armed habitual criminal, robbery, unlawful use of a weapon by a felon, and aggravated fleeing of peace officer.

---

[1]*Moore* was decided after this case had been briefed. This court granted the State's motion to cite *Moore* as additional authority, and petitioner was given the opportunity to respond.

*Id.* ¶ 6. One of the predicate felonies for the armed habitual criminal count was petitioner's 2004 conviction for aggravated unlawful use of a weapon. *Id.* This court affirmed the petitioner's convictions on direct appeal but vacated his conviction for unlawful use of a weapon by a felon, as it merged into the conviction for armed habitual criminal as a lesser-included offense. *Id.* ¶ 7. Two years after this court issued its judgment on petitioner's direct appeal, the supreme court invalidated portions of the unlawful use of a weapon statute in *People v. Aguilar*, 2013 IL 112116, ¶ 22. This decision rendered the petitioner's 2004 conviction for aggravated unlawful use of a weapon void. *Moore*, 2020 IL App (1st) 190435, ¶ 8. This, in turn, led the trial court to vacate the petitioner's conviction for armed habitual criminal. *Id.* The petitioner subsequently filed a petition for a certificate of innocence as to the armed habitual criminal count. *Id.* ¶ 9. The State intervened and objected, arguing that section 2-702 did not permit a certificate of innocence unless the defendant was innocent of all charges. *Id.* The circuit court disagreed with the State and granted the certificate of innocence " 'as to Count 1 only.' " *Id.*

¶ 67     On appeal, this court framed the issue as whether section 2-702 permits a " 'partial' " certificate of innocence; that is, whether an individual may obtain a certificate of innocence if he was wrongly incarcerated for one offense but properly incarcerated for another. *Id.* ¶ 17. The court found that petitioner was not entitled to a certificate of innocence because the "entire indictment" was not dismissed. *Id.* ¶ 25. The court noted that "[t]here is a wide difference between a charge or a count being dismissed and the indictment, in total, being dismissed." *Id.* The court found that the only purpose of the clause in the statute that " 'the indictment or information dismissed' " was to ensure that the law applied only to situations where "*all* the charges" were legally invalid. (Emphasis in original.) *Id.* ¶ 26.

¶ 68    This court concluded that a petitioner who is " 'innocent of the offenses charged in the indictment or information' " under section 2-702(g)(3) is "one who is innocent of *all* charges." (Emphasis in original.) *Id.* ¶ 30. The court explained that this decision was based on the purpose of the statute, which allows a successful petitioner to petition the court with "conclusive evidence of his or her innocence." *Id.* ¶ 37. But the court found that the petitioner in this case could not meet that burden because he was properly incarcerated on some convictions, even though he was improperly incarcerated on others. *Id.* ¶ 38. The court found that the petitioner was not entitled to a certificate of innocence even though he served a longer sentence than he otherwise would have if he had not been sentenced on the improper conviction. *Id.* ¶ 42.

¶ 69    Applying the principles of *Moore*, which we find was correctly decided, to the circumstances of this case, reveals that petitioner could not satisfy the elements of section 2-702(g) because he cannot establish that the "entire indictment" was dismissed. Instead, the State nol-prossed count I and agreed to amend count II to reckless discharge of a firearm. As the *Moore* court observed, "[t]here is a wide difference between a charge or a count being dismissed and the indictment, in total, being dismissed." *Id.* ¶ 25. In this case, although count I of the indictment was dismissed, count II was amended, not dismissed. Petitioner ultimately pled guilty to the amended count. As such, the "indictment, in total," was not dismissed because petitioner was not innocent of *all* charges. See *id.* ¶ 30. Petitioner does not challenge his guilty plea to the amended charge. It is immaterial that petitioner was sentenced on count I and that count was dismissed. It is likewise immaterial that petitioner ultimately served a longer prison term than he otherwise would have if he had not been sentenced on the improper conviction. See *id.* ¶ 42. Accordingly, in addition to finding that the circuit court did not abuse its discretion in finding that petitioner failed to establish that he was innocent by a preponderance of the evidence, we could alternatively affirm the circuit

court's denial of petitioner's petition on the basis that he failed to establish that the indictment was dismissed as required by section 2-702(g)(2).

¶ 70                                    III. CONCLUSION

¶ 71     For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 72     Affirmed.

**No. 1-19-2020**

| | |
|---|---|
| **Cite as:** | *People v. Gomez*, 2021 IL App (1st) 192020 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 97-CR-18961; the Hon. Leroy K. Martin Jr., Judge, presiding. |
| **Attorneys for Appellant:** | David B. Owens and Debra Loevy, of the Exoneration Project at the University of Chicago Law School, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein, Barbara J. Plitz, and Prathima Yeddanapudi, Assistant State's Attorneys, of counsel), for the People. |